22313

HUNTER BROTHERS SYSTEMS, INC., Appellant, v. BRANTLEY CON-
STRUCTION COMPANY, INC., and Insurance Company of North
America, Respondents.

(332 S. E. (2d) 206)

Supreme Court

*J. Randolph Pelzer* of *Pelzer & Chard,* Charleston, and *John C. B. Smith* of *Nexsen, Pruet, Jacobs & Pollard,* Columbia, *for appellant.*

*Thomas E. Pedersen,* Charleston, *for respondents.*

Heard Jan. 21, 1985.

Decided May 7, 1985.

CHANDLER, Justice:

Appellant Hunter Brothers Systems, Inc. (Hunter) subcontracted with the general contractor, Respondent Brantley Construction Company, Inc. (Brantley), to perform the electrical work on a warehouse (project) for State Ports Authority (Owner) at its Wando Terminal.

Upon completion of the project Brantley refused to pay Hunter the remaining $72,161.00 balance of the contract price. Brantley admits owing Hunter some amount but contends that, as the result of a breach of the contract by Hunter, it sustained additional costs which operated as a setoff against Hunter.

Hunter filed suit, denying the breach; Brantley answered and counterclaimed. The matter was referred to the Master in Equity for Charleston County under a stipulation that his order would be final.

The Master found that Hunter breached the contract, entitling Brantley to setoffs totalling $44,370.41, and awarded Hunter a final payment of $27,790.54. Hunter appeals.

We reverse.

## ISSUES

The issues to be determined are (1) which party breached the subcontract, and (2) what damages resulted from the breach.

## BACKGROUND FACTS

From the beginning the Wando project was beset by construction delays which culminated in the submission to arbitration of scheduling disputes between Brantley and the Owner.

The particular delay which brought about the controversy between Brantley and Hunter relates to the warehouse roof construction.

According to progress schedules (schedule) prepared by Brantley, as required under the general contract and testified to by witnesses for both parties, Hunter's electrical work was to commence February 23; actual installation of metal conduit, described as hollow aluminum tubing, however, was to begin March 2, being the same date established by the schedule for completion of the roof. Under its subcontractor Hunter was allowed eight (8) weeks from March 2 in which to complete its work.

On March 2 the warehouse roof had not been installed; indeed, the roofing material had not been received by Brantley from the supplier and was not entirely received as late as June 29.

Hunter, concerned over the effect of the roof delay upon its ability to meet the eight weeks deadline, discussed the problem with Brantley's project manager, Robert Sharpton.

Thereafter, Hunter's vice president, Jimmy Hunter, instigated a meeting in May, 1981, between ranking officials of Brantley, Hunter and the Owner to resolve the question of Hunter's start-up. No resolution was reached at the meeting, as a result of which Hunter refused to install conduit prior to completion of the roof.

The Master found that Hunter's refusal constituted a ■ breach of the subcontract and, after allowing numerous setoffs to Brantley for costs allegedly arising from the breach, awarded Hunter a portion only of the balance due. We disagree.

## PROGRESS SCHEDULES AND
## CONSTRUCTION DELAYS

The general contract between Brantley and the Owner was the standard A.I.A. form which included provisions pertinent to this litigation:

### 4.10 PROGRESS SCHEDULE

*The Contractor,* immediately after being awarded the Contract *shall prepare and submit for the Owner's information an itemized progress schedule* giving the sequence and dates for all major stages of the Work. This schedule should also include dates for submission of Shop Drawings and other required submittal data. This schedule must be submitted in such a form and in sufficient detail that it will be satisfactory to the Owner. *The Contractor shall thereafter so regulate his operations,* plans, working shifts, number of men employed *as to maintain a program in accordance with the schedule or such revisions thereof as are approved by the Owner.* The Contractor shall make periodic reports to the Owner comparing his actual progress with the progress schedule. The Contractor shall work his men overtime and add additional labor and equipment as is necessary to complete the Work on time or where impossible to complete on time, reduce the delay. Contractor must obtain the written consent of the Owner before scheduling overtime work. [Emphasis supplied].

Pursuant to the foregoing section Brantley prepared detailed schedules setting out in graph form the beginning and completion dates for all construction to be performed on the project.

However, Brantley failed to abide by its own schedule, not only with respect to the electrical work of Hunter, but in other phases of the construction as well. Owner's witnesses, Setzler and Collins, address this condition in much detail in their testimony, to include extensive delays in the erection of building slabs, the construction of the concrete building, installation of rolling steel doors, etc.

There is nothing in the record to attribute any construction delays to Hunter, or to indicate that Hunter was not ready and able to install conduit on March 2. The evidence is clear that the sole reason installation did not commence on that date was Brantley's failure to complete the roof.

When the scheduled March 2 date for commencement of conduit installation passed, Brantley made no move at that time to compel start-up by Hunter. Indeed, the earliest communication after March 2 between the parties, relative

conduit installation, was in May, 1981, when Jimmy Hunter advised Sharpton that Hunter needed to get started. This conversation brought about the meeting in May, 1981, in Setzler's office, alluded to earlier in this opinion, which was attended by ranking officials of the three principals involved.

## MEETING OF MAY, 1981

Present at the meeting on behalf of Hunter was Jimmy Hunter; on behalf of Brantley, Sharpton; and on behalf of the Owner, Larry W. Setzler, its engineer and on-site manager for the project, and George M. Collins, its employee designated "to insure the electrical work followed the plans and specifications."

The versions of Jimmy Hunter, Setzler and Collins as to what transpired at the meeting are essentially identical. On the other hand, Sharpton denied any recollection of such a meeting in both his pre-trial deposition and initial testimony at the trial. In recall testimony, after Setzler, Collins and Jimmy Hunter had testified fully concerning its events, he did admit to a recollection of the meeting.

Section 4.10 of the general contract required Brantley to prepare "an itemized progress schedule giving the sequence and dates for all major stages of the Work." It then required Brantley to "so regulate his operations ... as to maintain a program in accordance with the schedule or such revisions thereof *as are approved by the Owner.*" [Emphasis supplied].

Recognizing the requirement in § 4.10 that schedule revisions receive approval of the Owner, Hunter sought permission of the Owner to install conduit prior to roof completion. Setzler, representing the Owner, granted a *conditional* approval:

A. I then told the — speaking to Mr. Sharpton — only speaking from the Port Authority to the general contractor — *I told him (Sharpton) if he would take responsibility for the conduit going in at this time that, yes, I would allow it to go in.*

Q. When you say he take responsibility, *who did you mean by he?*

A. *Meaning Brantley Construction Company.* [Emphasis and parenthesis supplied].

Jimmy Hunter, concerned not only with the Owner's expressed prerequisite that Brantley accept responsibility, but also with damages Hunter might sustain from construction deficiencies arising by reason of installing the conduit out of the scheduled sequence, then discussed the situation with Sharpton, as related by Setzler:

Q. What was Mr. Sharpton's response?

A. Well, Mr. Sharpton and Mr. Hunter then discussed the situation between the two of them, and *Mr. Hunter asked Mr. Sharpton to take the responsibility and the answer was no.*

Q. What was your understanding as a result of this meeting about whether Hunter Brothers was going to install the conduit at that time?

A. It was my interpretation from what took place after that the conduit would not go up at the present time.

Q. *When was your understanding that the conduit would start going up?*

A. *As scheduled by the construction progress schedule at that time.*

Q. And what did the construction progress schedule say or show with respect to the installation of the conduit?

A. Well, it was a bar chart type of construction progress, but that type of work would have happened late in the project and after the roof went on.

Q. Were you aware that the conduit was not being installed in June and July of 1981?

A. Yes, sir.

Q. Was that of any surprise to you?

A. Not since the meeting in May, no sir. [Emphasis supplied].

Collins, the Owner's other representative at the meeting in May, testified:

Q. Okay. Do you remember meeting in May to discuss the status of the — of what could be done at that point in time?

A. Yes, I do.

\*　　\*　　\*　　\*

Q. And what transpired at that meeting?

A. Mr. Hunter was concerned that Brantley wanted to install the electrical conduits on the structure of the building before the roof was completed. *At that time, Mr. Seitzler [sic] told Brantley we have no objection to the conduit being installed provided you or your subcontractor take the responsibility for any damage due to rust or anything.*

*Mr. Sharpton's response was that they didn't take responsibility for anything.*

Q. What was your understanding as a result of that meeting about the installation of conduit?

A. It was my understanding that the conduit wouldn't go in until after the roof was on. [Emphasis supplied].

The evidence is clear that Brantley's insistence on conduit installation without regard to roof completion was based upon its concern that late completion of the project would result in assessment of liquidated damages. However, the evidence is equally clear that roof completion precedes conduit installation for two reasons of practice in the construction trade. First, the roof provides the cover to insure against conduit rust from rain and the elements and second, conduit is often damaged by workmen while installing the roof.

These were Hunter's concerns, which were underscored and heightened by the undisputed testimony that Collins specifically instructed Jimmy Hunter not to install the conduit prior to roof completion. They were also the Owner's concerns and are reflected in Setzler's refusal to approve Hunter's installation of conduit prior to roof completion, unless Brantley would assume responsibility for adverse consequences.

Collins testified specifically to Owner's concern about damage to the conduit from installation prior to roof completion. Admittedly, Brantley offered testimony to the contrary.

In the end, however, the legal propriety of Hunter's conduct is not determined by a factual finding on the weight of this conflicting evidence but, rather, upon the Owner's refusal to approve the sequence change in Brantley's progress schedule.

In his order the Master states, "The Plaintiff, *although no objection was raised by the South Carolina Ports Authority*, refused to commence installation of the conduit unless Brantley would take responsibility therefor." Tr. 763 [Emphasis supplied].

The italicized portion of this statement, "although no objection was raised by the South Carolina Ports Authority," is a contradiction of the record. The very essence of Ports Authority's position was its expressed objection to Hunter's early commencement of conduit installation unless Brantley would take responsibility therefor.

### BREACH OF CONTRACT

It is patent from the record:

> that Brantley's § 4.10 progress schedule provided for completion of the roof on March 2, 1981, and for commencement of conduit installation on that same date;

> that the roof was not completed on March 2 and, indeed, its construction did not commence until late in June, and it was not completed until the middle of August;

> that changes in the schedule required approval of the Owner;

> that the required approval of a change in the sequence of roof construction and conduit installation was not obtained.

We hold that, absent such Owner approval, Brantley's instruction that Hunter proceed breached their contract. Any expenditures voluntarily incurred by Brantley following Hunter's refusal to proceed do not operate as setoffs.

Accordingly, we further hold that the Master erred in awarding setoffs to Brantley. Hunter is entitled to the remaining balance of $72,161.00

Appellants' remaining exceptions are without merit and are affirmed pursuant to Supreme Court Rule 23.

Reversed and remanded.

LITTLEJOHN, C. J., and NESS, GREGORY and HARWELL, JJ., concur.